Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Joseph S. McMillen (SBN 174561) *jm@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff John Linford

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JOHN LINFORD,<br><br>                Plaintiff,<br><br>vs.<br><br>PRINCIPAL LIFE INSURANCE COMPANY; and DOES 1 through 10, inclusive,<br><br>                Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES<br><br>[Filed Concurrently With:<br>  -  Civil Cover Sheet;<br>  -  Summons; and<br>  -  Certification of Interested Parties] |

## NATURE OF ACTION

1.     In this lawsuit, Plaintiff John Linford seeks to recover long-term disability ("LTD") benefits from Defendant Principal Life Insurance Company ("Principal") because he suffers from debilitating low back, mid-back, neck and bilateral leg, foot, arm, elbow, wrist, hand, finger and thumb pain, numbness, tingling and weakness from pinched nerves in his lumbar and cervical spine, elbows and wrists (caused by herniated, slipped and bulging discs, arthritis, osteophytes, degenerative disc disease and radiculopathy in his lumbar and cervical spine, and cubital and carpal tunnel syndrome from repetitive typing and computer use), all objectively verified.  He seeks to recover residual disability benefits because, while he can work part-time in a limited capacity, he can no longer perform his own occupational duties with reasonable continuity (a full-time, purely sedentary position), or those of any other type of occupation for which he qualifies.

2.     His employer provided a group LTD benefit plan for the benefit of its employees, including Plaintiff.  Principal funded the plan through a group insurance policy and is the claim administrator for the plan.  Plaintiff was enrolled for the disability coverage when he became disabled in December 2014 but, after Principal conceded he was disabled and paid him total or residual disability benefits for two years under the own occupation clause of the policy, it illogically reversed course. It improperly terminated his benefits in May 2017, based on the plan's change in definition of disability from "own occupation" to "any occupation," even though he was still obviously residually disabled under both standards and despite having no significant evidence that his disabling condition had improved.  Principal relied on conclusory "paper reviews" of his medical records and vocational analyses that are not credible, easily refuted and contradicted by every physician who examined Mr. Linford in person, that concluded he could perform six specific full-time sedentary



occupations.  Even the Social Security Administration found Mr. Linford disabled from any gainful occupation.

3.    Principal improperly failed to pay Plaintiff the benefits due him under the policy and the plan, from May 2017 onward, and he is also entitled to interest and his attorneys' fees.  The employee welfare benefit plan and this action are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

## THE PARTIES

4.    Plaintiff is an individual who, at all times relevant to this action, was a citizen and resident of the State of California, City of Irvine, in Orange County.  At all times relevant to this action, Plaintiff was a participant, as defined by Section 3(7) of ERISA, 29 U.S.C. Section 1002(7), in the employee welfare benefit plan that is at issue in this action and was established by his former employer, Word & Brown Insurance Administrators, Inc. ("Word & Brown"), a health insurance brokerage company.

5.    Defendant Principal is, and at all times relevant was, an Iowa corporation and stock insurance company with its principal place of business located in Des Moines, Iowa.  Defendant Principal, at all times relevant, administered LTD benefits provided to Word & Brown employees, including Plaintiff, by issuing group long term disability insurance policy number GLT H68484 to Word & Brown (the group policyholder) for the benefit of its employees (the "Policy").  The Policy, which Principal issued, is and was the funding source of the LTD benefits for Word & Brown's employee welfare benefit plan.  Principal is responsible to pay LTD benefits due under the plan.  The Word & Brown employee welfare benefit plan, including Principal's group Policy, the certificate of insurance and all other plan



contract documents, are hereafter referred to collectively as "the Plan."  The Plan, including Principal through the group Policy and certificate, promised to pay LTD benefits to Plaintiff should he become disabled.  Defendant Principal has acted as a claims administrator and as an ERISA claims fiduciary of the Plan in connection with LTD benefits and the group Policy.

6.      The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained. DOES 1 through 10 are sued as principals and/or agents, servants, attorneys and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

## JURISDICTION AND VENUE

7.      Plaintiff brings this action to recover disability insurance benefits and to enforce and clarify his rights under section 502(a)(1)(B) of ERISA, 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

8.      Venue lies in the Central District of California pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this



district, the alleged breaches occurred in this district and the ERISA-governed plan at issue was administered in part in this district.  Venue is also proper pursuant to 28 U.S.C. Section 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred within this district.  Namely, Principal denied Plaintiff's claim in Irvine, California, in Orange County, within this district.

9.    Plaintiff alleges that Defendant Principal is, and at all times relevant was, duly authorized to do, and doing, business within the County of Orange, State of California, within the judicial district of the Central District Court of California.

## **FACTUAL BACKGROUND**

10.    Mr. Linford began working for Word & Brown in 2014.  At the time he became disabled in December 2014, Mr. Linford was employed as one of its health insurance benefit advisors – his official title was "National Benefit Advisor."  He held that same position the entire time he worked for Word & Brown.  He was, essentially, a telephone health insurance policy salesman.  He was always required to work full time, 40 or more hours per week, eight or more hours per day (with a half-hour break).  He sat at a desk in a large call center and used a computer and phone all day.  His position was purely sedentary.  His material job duties included: selling health insurance policies (including Medicare and individual/family health insurance plans); calling people based on leads to try and sell them a policy; taking calls when prospective customers would phone the call center with questions regarding how to enroll, which he would then answer; typing notes from the calls into the computer; typing emails; and searching/navigating between several websites on the computer while on the phone to select the most appropriate insurance plan for the customer.  The physical requirements of his position included, among other things: sitting at his desk for the entire workday, "constantly" for "6-8+ hours" but

Case No.:



usually 7.5 hours per workday and sometimes much more at month end or to meet quotas; bending his head/neck for three hours per workday and twisting his head/neck for three hours per workday (to look at the computer monitor and to use the phone) – looking at the computer occurred all day for the entire shift; repetitively using his hands "constantly" for "6-8+ hours" for his mouse and keyboard, extensively; and reaching below his shoulder level and forward to his workstation "constantly" for "6-8+ hours" (to use his mouse and keyboard which he used "extensively").

11.     In the eight years prior to becoming disabled, Mr. Linford was employed mostly in the same type of job as at Word & Brown, selling health insurance policies via the telephone and computer and, prior to that, about four years assisting mortgage brokers sell mortgages.  He had been in health insurance or mortgage sales for over 20 years.  Mr. Linford has an Associates of Arts degree but no other college education.

12.     Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to LTD benefits because he met, and continues to meet, the Plan's operative definition of "disabled" and the other conditions necessary to qualify for LTD benefits during the requisite time period.  The Plan and, specifically, the Policy defines "disabled" as "Total or Residual Disability" and states in pertinent part that:

> *A Member will be considered Residually Disabled if:*
>
> During the Elimination Period [three months] and the Own Occupation Period [two years of payments], the Member is not Totally Disabled and while working in his or her Own Occupation, as a result of sickness or injury, he or she is unable to earn 80% or more of his or her Predisability Earnings.
>
> After completing the Elimination Period and the Own Occupation Period, *the Member is not Totally Disabled and while working in an occupation, as a result of sickness, or injury, he or she is unable to engage with reasonable continuity in any other occupation* in which he





or she could reasonably be expected to perform satisfactorily in light of the Member's age, education, training, experience, station in life, and physical and mental capacity.[1]
* * * *

A Member will be considered Totally Disabled if, as a result of sickness or injury:

During the Elimination Period and the Own Occupation Period, the Member is unable to perform with reasonable continuity, the Substantial and Material Duties necessary to pursue his or her Own Occupation and the Member is not working in his or her Own Occupation.

After completing the Elimination Period and the Own Occupation Period, the Member is unable to perform with reasonable continuity in any occupation for which he or she is or could reasonably be expected to perform satisfactorily in light of his or her age, education, training, experience, station in life, and physical and mental capacity.
* * * *

*However, in no event, will benefits continue beyond: . . . g. the date the most recent one month average of the Member's Current Earnings exceeds 80% of the Member's monthly Predisability Earnings if the Member is Residually Disabled.* (Emphasis added).[2]

13.     The Policy does not define "any occupation" or "any other occupation." It defines "Own Occupation" as: "The employment, business, trade, or profession that involves the substantial and material acts of the occupation the Member was regularly performing for the Policyholder when the Disability began. Own

---

[1] This "any other occupation" residual disability clause of the Policy is most relevant because Principal conceded that Mr. Linford was disabled for the three-month Elimination Period and conceded and paid his benefits for the entire two-year "Own Occupation" period.  And because Mr. Linford continued to work part-time after Principal terminated his disability benefits.  Yet, Mr. Linford has been unable to perform with reasonable continuity because of his orthopedic injuries and thus has consistently made dismal earnings from his part-time work.

[2] The Residual Disability definition explicitly states that the insured can work and still get Residual Disability benefits.  In fact, the Policy permits a claimant to work and still be considered residually disabled if his average current earnings are 0%-80% of his Predisability Earnings and he cannot engage with reasonable continuity in any other occupation because of his back/neck/extremity injuries.  Mr. Linford worked part-time at multiple jobs (after Principal terminated his disability benefits in May 2017 through the present).  He worked at Word & Brown before that.  But, after Mr. Linford became disabled, his earnings have continuously remained below the 80% threshold of Predisability Earnings and, thus, was and is disabled under the Policy at all relevant times.  Principal knew that Mr. Linford worked part-time, but it still paid him residual disability benefits.  Each month, it deducted his current work earnings from his disability benefit according to the Policy's formulas.

Occupation is not necessarily limited to the specific job the Member performed for the Policyholder."  It defines Predisability Earnings as, "A Member's Monthly Earnings in effect prior to the date Disability begins," which, in Mr. Linford's case, were $8,592.69 per month as established by Principal.

14.     Mr. Linford, at all relevant times, has been residually disabled within the meaning of the Policy.[3]  He is entitled to monthly disability benefits according to the Policy's formulas, commencing on May 18, 2017 (the day Principal ceased paying his benefits), subject to the Policy's "Other Income Sources," "Benefits Payable," and "Income Loss Percentage" sections.

15.     As of December 18, 2014, Mr. Linford was unable to engage with reasonable continuity in his material job duties at Word & Brown due to debilitating low back, mid-back, neck and bilateral leg, foot, arm, elbow, wrist, hand, finger and thumb pain, numbness, tingling and weakness from pinched nerves in his lumbar and cervical spine, elbows and wrists caused by herniated, bulging and slipped discs, arthritis, osteophytes, degenerative disc disease and radiculopathy in his lumbar and cervical spine, and cubital and carpal tunnel syndrome[4] from repetitive typing and computer use.  Mr. Linford was actively at work and eligible for disability benefits under the Plan on his date of disability, December 18, 2014, and his last day of work at Word & Brown, November 17, 2015.  But as of December 18, 2014, his injuries rendered him residually disabled from working in his own sedentary occupation as a telephone health insurance policy salesman, and any other

_____

[3] Alternatively, Plaintiff alleges on information and belief that he has been totally disabled within the meaning of the Policy.
[4] Carpal tunnel syndrome is numbness, tingling, weakness and pain in the hand and fingers due to pressure on the median nerve in the wrist.  Cubital tunnel syndrome is similar; it causes numbness/pain in the forearm, hand and fingers due to pressure on the ulnar nerve (elbow/"funny bone" nerve).

1 | type of occupation, within the meaning of the Policy.

2

3 |      16.    To date, Plaintiff's problems have not resolved.  He is currently unable

4 | to sit, stand, walk or drive for prolonged periods, continuously type on a computer

5 | keyboard and/or use a mouse, use his right hand repetitively, reach above his waist

6 | level and forward to his workstation to do those actions, hold his head up to look at

7 | a computer for long periods of time or bend his neck, without severe pain in his

8 | back, neck, lower extremities and upper extremities, which tasks are all required by

9 | his pre-disability job and the other sedentary jobs to which Principal claims Mr.

10 | Linford can transition.  He is unable to perform these material job duties more than

11 | part-time or with reasonable continuity because of his chronic back, neck, leg, feet,

12 | arm, elbow, wrist, hand, finger and thumb pain, numbness, tingling and weakness,

13 | which pain is exacerbated by sitting, standing, walking, bending his neck or holding

14 | it in the same position, and continuous typing and mouse use.  Plaintiff's injuries

15 | have rendered him residually disabled from working within the meaning of the

16 | Policy.  Because of this, he is and was unable, at all times from December 2014

17 | through the present and continuing, to engage with reasonable continuity in his own

18 | occupation as a telephone health insurance policy salesman and any other

19 | occupation for which he is qualified.  While he has worked part-time hours in

20 | multiple jobs since he became disabled (of which he was eventually terminated from

21 | due to his poor performance caused by his disability), he was and is residually

22 | disabled as the Policy so defines (which allows part-time work up to 80% of his

23 | Predisability Earnings).

24

25 |      17.    After the onset of his disabling injuries, Mr. Linford applied for and

26 | received residual LTD benefits from Principal for two years, from May 18, 2015

27

28

-8-



through May 17, 2017 (for the Policy's entire "own occupation" period).[5]  As alleged later below, however, Principal prematurely terminated Mr. Linford's residual LTD benefits while he was still partially disabled.

18.     On his November 2015 application, Mr. Linford identified his treating physicians and provided their contact information.  He reported that he became at least partially disabled from working as of December 8, 2014 because of chronic pain caused by repetitive sitting at his desk and computer use on the job.  He submitted a statement from his pain management physician, Phong Tran, M.D., who, based on his clinical exam and objective range of motion tests, certified his inability to work in his sedentary position at Word & Brown (after having reviewed his job duties), for more than six hours per day, due to low and mid-back and neck pain radiating to his legs and arms, bilateral elbow pain, right wrist pain, and insomnia from his pain.  Dr. Tran gave Mr. Linford the following work restrictions and limitations: (1) Work at most six hours per day; (2) Sit at most two hours total per six-hour workday (⅓ of the time); (3) Stand at most two hours total per six-hour

_____

[5] Mr. Linford took a leave of absence.  When he returned to work at Word & Brown, he was not able to perform his material job duties with reasonable continuity.  He tried to work full time but had to go on FMLA, miss work, and work with restrictions and modifications.  Because of his disability, he performed horribly and made little money in his commission-based job.  Word & Brown therefore terminated Mr. Linford on November 17, 2015 because he could not do his job properly with his orthopedic injuries.  Principal paid Mr. Linford residual disability benefits while he worked and deducted his work earnings from his monthly disability benefit, since the Policy permits an insured to work and still receive a residual benefit instead of the full monthly amount.  Multiple other employers have since also fired Mr. Linford because, despite his best efforts to work and earn a living, he is unable to do so with reasonable continuity given his chronic back, neck, leg, feet, elbow, wrist, and hand pain.  For example, on May 4, 2018, Mega Capital Funding, Inc. aka TriNet ("Mega Capital") terminated Mr. Linford because he was unable to work with reasonable continuity and not performing his job duties adequately due to his injuries.  On September 16, 2019, Breeze Funding did so for the same reasons.  He had to take frequent breaks and often miss work because of his pain and for doctor appointments, which lead to poor performance.  He tried in good faith to work with reasonable continuity and to work full time, but he failed due to his disabling injuries and was let go from both positions.  True and correct copies of Mr. Linford's email exchanges with Mega Capital and Breeze Funding about his employment terminations are attached to the Complaint as Exhibits "1" and "2," respectively.

Case No.:



workday (⅓ of the time); (4) Walk at most two hours total per six-hour workday (⅓ of the time); (5) Keyboard at most two hours total per six-hour workday (⅓ of the time); (6) Lift/carry no more than ten pounds; (7) Never reach above his shoulder; and (8) Mandatory ten-minute break every hour from working.

19.     Just prior to his application, on May 23, 2015, West Coast Radiology Centers did lumbar and cervical spine MRIs on Mr. Linford, as ordered by his treating physicians, because he had experienced chronic low back pain, neck pain, right leg pain, numbness and weakness, right arm pain, numbness and weakness, and tingling in his hand and fingers, for months to years.  His lumbar MRI objectively documented that he had: **(1)** <u>At L4-5</u>, a "1 to 2 mm bulging disc" and **(2)** <u>At L5-S1</u>, **(A)** ***Severe right and moderate to severe left foraminal narrowing compressing the exiting right L5 nerve root*** *(narrowing of the foramen openings in the vertebrae of his low back spine where his nerves pass through from the spinal canal outside it to travel to his lower extremities causing a pinched nerve in his low back/spine)* – caused by a "3 mm retrolisthesis [vertebrae slips backward along or underneath disc] of L5 on S1 with uncovering of the disc" and bilateral facet arthropathy (arthritis in facet spine joints where spinal nerves pass through) including osteophytes (bone spurs), **(B)** Moderate disc desiccation (loss of fluid in his spinal discs causing back pain, stiffness and numbness), and **(C)** Chronic degenerative disc disease (deterioration of spinal discs causing back pain, numbness and weakness that radiates to his legs).  His cervical MRI objectively documented that he had: **(1)** <u>At C4-5</u>, a "1 to 2 mm bulging disc" with moderate left foraminal narrowing; **(2)** <u>At C5-6</u>, "a 2 to 3 mm bulging disc/osteophyte complex" with left foraminal narrowing; **(3)** <u>At C6-7</u>, a "1 to 2 mm bulging disc/osteophyte complex" with bilateral foraminal narrowing; and **(4)** Chronic degenerative disc disease.

20.     On July 8, 2015, Filemon Quinio, M.D., a physiatrist retained through

Case No.:



1  the workers' compensation process, performed a neurologic exam and

2  electromyography ("EMG") and nerve conduction velocity ("NCV") studies on Mr.

3  Linford's upper extremities to determine whether his neck pain, upper extremity

4  pain and bilateral hand pain, numbness and tingling were caused by cervical

5  radiculopathy,[6] ulnar nerve neuropathy (cubital tunnel syndrome), and/or median

6  nerve neuropathy (carpal tunnel syndrome).  Mr. Linford complained during the

7  exam that he had right-sided neck pain that radiated into his arm, and pain,

8  numbness and tingling down to both hands.  Dr. Quinio placed needle electrodes

9  into Mr. Linford's upper extremity muscles to test his nerve roots with EMG

10  technology, and he also used wave/NCV technology to test the nerve roots.  The

11  EMG and NCV studies objectively measured that Mr. Linford had abnormal activity

12  in several of his upper extremity muscles and nerves.  Dr. Quinio also did sensation,

13  motor and strength tests during his neurologic/physical exam that corroborated that

14  Mr. Linford had: (1) Decreased sensation in his fingers (right hand); (2) Atrophy

15  (wasting away of muscle mass) of his right ball of thumb (thenar eminence) and left

16  hand (interrosei space) muscles; and (3) Weakness in his right top of thumb muscle

17  (abductor pollicis brevis).  Dr. Quinio concluded that the EMG/NCV studies (and

18  neurologic exam test results) showed that Mr. Linford had: (1) Cervical

19  radiculopathy (pinched nerve) at the C6 and C7 level of his spine (on the right side

20  of his neck) that impacted his right forearm (pronator teres) and right triceps

21  muscles; (2) *Severe* cubital tunnel syndrome/ulnar neuropathy (compressed nerve)

22  in his left elbow that impacted his left ring finger, left little finger, and left hand

23  (first dorsi interossei), palm of hand (abductor digiti minimi) and forearm (flexor

24

---

25  [6] Radiculopathy is a condition due to a compressed nerve as it exits the spinal
column that causes pain, numbness, tingling, or weakness along the course of the

26  nerve, i.e., in the legs or arms. Radiculopathy can occur in any part of the spine, but
it is most common in the lower back (lumbar radiculopathy which radiates pain

27  from the pinched nerve in the low back to the legs) and in the neck (cervical
radiculopathy which radiates pain from the pinched nerve in the neck to the arms).

28  *See* https://sportsmedicine.mayoclinic.org/condition/radiculopathy/ and
http://www.medicinenet.com/radiculopathy/article.htm.

Case No.:



carpi ulnaris) muscles; (3) Mild cubital tunnel syndrome/ulnar neuropathy in his right elbow that impacted his right ring finger; (4) *Severe* carpal tunnel syndrome/median nerve neuropathy (compressed nerve) in his right wrist radiating to his right forearm and top of thumb (abductor pollicis brevis) muscles; and (5) Left radial sensory neuropathy over his left thumb.  In sum, Dr. Quinio objectively verified that Mr. Linford had pinched and compressed nerves in his cervical spine (radiculopathy), left and right elbows (cubital tunnel syndrome) and right wrist (carpal tunnel syndrome) that radiated severe pain, tingling, numbness and weakness from the pinched nerve areas up and down to his upper extremities (including to his right triceps, right and left elbows, right and left forearms, right wrist, right hand, right thumb, right fingers, and left hand, left thumb and left fingers).

21.     On July 20, 2015, Dr. Quinio performed a second neurologic exam and EMG and NCV studies.  This time on Mr. Linford's *lower* extremities to determine whether his low back pain and bilateral leg pain and numbness were caused by lumbar radiculopathy or neuropathy.  Mr. Linford complained during the exam that prolonged sitting caused him back pain and numbness that radiated to his "right lower extremity."  Just like before, Dr. Quinio placed needle electrodes into Mr. Linford but this time into his lower extremity muscles to test his nerve roots with EMG technology, and he again used wave/NCV technology to test the nerve roots. Dr. Quinio did reflex tests during his physical/neurologic exam that showed Mr. Linford's knee jerks and ankle jerks were abnormal at "+1" and "0," respectively.[7] Dr. Quinio concluded that Mr. Linford had "a possible right S1 radiculopathy" and asked the workers' compensation claims examiner to confirm his opinion by "correlate[ing] with the lumbosacral spine MRI."  Mr. Linford's May 2015 lumbar MRI showed that he did indeed have a right S1 radiculopathy, i.e., it showed, "At

---

[7] *See* https://www.ncbi.nlm.nih.gov/books/NBK396/ (0 means "always abnormal," 1+ means "may or may not be normal," and 2+ is normal).

Case No.:



L5-S1 . . . severe right . . . foraminal narrowing with compression of the right L5 nerve root."  The MRI corroborated Dr. Quinio's opinion, based on his EMG/NCV studies, that Mr. Linford had radiculopathy on the right side of his lumbar spine which caused him low back and right lower extremity pain and numbness.

22.     In April 2016, Michael Rothman, M.D. conducted lumbar, thoracic, and cervical spine MRIs on Mr. Linford.  His lumbar MRI objectively documented that he had: **(1)** <u>At L4-5</u>**, a "2 mm"** *disc herniation* **with disc and facet changes; and (2) <u>At L5-S1</u>, "2 to 4 mm"** *disc herniations* **with significant disc and facet changes**.  His thoracic MRI objectively documented that he had: "Multi-level secondary disc and facet changes."  His cervical MRI objectively documented that he had: "Multi-level secondary disc facet changes contributing primary to *foraminal stenosis from C3 to C7*," i.e., a narrowing of the foramen openings in his cervical spine where his spinal nerves pass through from his spinal column outside it to his arms. (Emphasis added).

23.     On December 14, 2016, Eric Yokoo, M.D., a physiatrist hired by Principal through Medical Consultants Network ("MCN"), conducted an in-person "independent" medical examination ("IME") of Mr. Linford.  Mr. Linford complained of: (1) Constant pain in his upper and lower back and neck varying from "2-4/10 up to 10/10" in severity, worse on the right side of his neck than the left; and (2) Numbness and tingling in both his hands, all fingers, and in both his feet, worse on the left.  During his exam, Dr. Yokoo conducted objective range of motion, palpation, "pinwheel," and several other tests on Mr. Linford's lumbar spine, lower extremities, cervical spine, upper extremities, wrists, forearms, and elbows.  The tests were abnormal in many respects.  Dr. Yokoo documented that Mr. Linford was tender to palpation in all these areas.  And, that he had abnormal range of motion in his lumbar and cervical spine, diminished sensation in the right

Case No.:



L4 and L5 areas of his lumbar spine, diminished sensation in the left L4 area of his lumbar spine, abnormal left and right patellar and Achilles reflexes of "0," and marked and moderate-to-severe atrophy in his left- and right-hand muscles.  Dr. Yokoo observed during his lumbar exam that, "Range of motion is performed with pain and tightness."  He also observed that Mr. Linford had to shift positions while seated every ten minutes due to his back pain.  Dr. Yokoo reviewed Mr. Linford's medical records, MRIs, and EMG/NCV studies.

24.     Based thereon, Dr. Yokoo wrote an IME report of his opinions in December 2016 (and three supplemental reports on February 3, February 28, and March 2, 2017 to clarify his opinions, but without reviewing additional materials or examining Mr. Linford again).  ***Principal's own medical consultant*** concluded that *Mr. Linford had "**permanent**" work restrictions and limitations* due to chronic, "severe" bilateral cubital tunnel and carpal tunnel syndrome, lumbar radiculopathy at S1, lumbar strain, lumbar spondylosis (wearing down of spinal vertebrae and discs, also called degenerative disc disease or osteoarthritis), cervical strain and cervical spondylosis.  The limitations Dr. Yokoo imposed included: (1) Grasp, fine manipulation and reach below shoulder level with right or left arm/hand (such as to desk level to type and mouse) at most 0 to 2.6 hours total per eight-hour workday (rarely, less than ⅓ of the time); (2) Drive at most 0 to 2.6 hours total per eight-hour workday (rarely, less than ⅓ of the time); (3) Bend/twist at waist at most 0 to 2.6 hours total per eight-hour workday (rarely, less than ⅓ of the time); (4) Bend/twist at neck at most 0 to 2.6 hours total per eight-hour workday (rarely, less than ⅓ of the time); (5) Reach above shoulder and squat at most 0 to 2.6 hours total per eight-hour workday (rarely, less than ⅓ of the time); (6) Ten minute break every hour from working; and (7) "Appears to be able to function at a sedentary [work] level," but only *if* he can change positions as needed for comfort and his workplace



accommodates all these work restrictions and limitations.[8]  Dr. Yokoo concluded

that, "There doesn't appear to be any significant change in his medical condition"

from the time of his December 2014 disability onset onward because his medical

conditions are chronic, permanent, and will not change.  He concluded that Mr.

Linford's subjective complaints of neck and back pain with tingling and numbness

in his arms and legs "do correlate with the examination and MRI findings."


25.     On January 16 and 24, 2017, Howard Fishbein, M.D., a family doctor

from Family Care Centers, examined Mr. Linford in-person.  Mr. Linford

complained of chronic bilateral low back pain and right upper extremity/shoulder

pain.  Dr. Fishbein ordered bloodwork which showed he was positive for ANA, an

indicator of lupus.  He documented that Mr. Linford had back pain, bone/joint

symptoms, myalgia (muscle/ligament/soft tissue aches and pain), and

"rheumatologic manifestations."  Dr. Fishbein diagnosed Mr. Linford with: (1)

Chronic low back pain; (2) Chronic right shoulder pain; and (3) Possible lupus.  He

referred him to a rheumatologist to evaluate whether he had lupus.


26.     On February 14, 2017, Mr. Linford had the consult with the

rheumatologist specialist, Christine Leehealey, M.D, of Hoag Hospital, because of

his chronic pain and to determine whether he had lupus.  He complained of severe

low back pain and stiffness exacerbated by sitting (which caused Word & Brown to

fire him because he could not sit for long periods and "was taking too many

breaks"), nerve impingement, numbness and tingling pain in his feet, joint pain, and

elbow pain.  Dr. Leehealey checked him for systemic lupus erythematosus ("SLE"),

---

[8] In Dr. Yokoo's March 2, 2017 supplement, he gave Mr. Linford all these same
permanent work restrictions and limitations.  Except he changed his opinion about
Mr. Linford's ability to grasp, fine manipulate and reach below his shoulder level
with his right or left arm/hand (such as to desk level to type and mouse), from
"[r]arely ($<$ ⅓ of time)" to "[o]ccasionally ([u]p to ⅓ of time)" of an eight-hour
workday.  This is a distinction without a meaningful difference.  Both rarely and
occasionally on the preprinted form mean the same thing, 0 to 2.6 hours.

Case No.:



1   an autoimmune disease that causes widespread inflammation, joint and tissue pain.

2   She reviewed the blood labs that Dr. Fishbein ran which showed he was positive for

3   ANA and low positive for dsDNA, both signs of SLE.  Dr. Leehealey conducted a

4   physical exam, including objective clinical tests.  Her tests confirmed that Mr.

5   Linford was positive for tingling and numbness on neurological exam and had

6   decreased sensation in his ankles and feet consistent with neuropathy on

7   musculoskeletal exam, as well as muscle atrophy and deformities in both hands.  Dr.

8   Leehealey ruled out SLE because he did not have all the classic symptoms, but

9   instead she diagnosed Mr. Linford with: (1) Paresthesia and neuropathic symptoms

10  (burning and tingling pain and numbness from carpal tunnel or nerve damage) in his

11  hands and feet; (2) Arthralgias (joint pain); and (3) Myalgias.

12

13      27.    On May 30, 2017, despite the overwhelming medical documentation

14  supporting his partial disability and without a significant change in his medical

15  condition, Principal wrote a letter to Mr. Linford informing him that it was

16  terminating his disability benefits beyond May 17, 2017.[9]  Yet, Principal

17  simultaneously concluded that residual disability benefits were no longer payable

18  under the Policy's "any other occupation" disability standard because Mr. Linford

19  was purportedly "currently working and able to engage with reasonable continuity"

20  in his "new occupation [with Mega Capital Funding] on a full time basis" as an

21  account executive selling mortgages.  Principal did not rely on any medical peer

22  review report or vocational analysis for its decision, just its communications with

23

24

25

26  [9] In the same letter, Principal overturned its prior denial decisions.  It concluded that
    Mr. Linford had been totally or residually disabled from performing his own
27  sedentary occupation as a telephone health insurance policy salesman with Word &
    Brown since December 18, 2014, and it therefore agreed to pay his benefits for two
28  years, from May 18, 2015 through May 17, 2017, for the entire "own occupation"
    period.

Case No.:



Mr. Linford.[10]

28.     On August 25, 2017, shortly after Principal had terminated his disability benefits, Sandra Herman, M.D., Mr. Linford's treating family practice physician with Kaiser, examined him in-person.[11]  Mr. Linford complained of moderate-to-severe low back pain and numbness and tingling pain in both of his feet (toes).  He reported that he had experienced these symptoms for "2 years +," *but that they started to worsen a few months ago.  Mr. Linford reported that "prolonged sitting" aggravated his low back pain and lower extremity numbness/tingling.*  Dr. Herman performed a physical exam, including objective clinical tests.  Her tests confirmed that Mr. Linford was positive for tingling on neurological exam and had abnormal reflexes of 1+ in his left patellar.  Dr. Herman diagnosed Mr. Linford with: (1) Chronic low back pain; (2) Lumbar radiculopathy; and (3) Paresthesia (burning/tingling/numbness sensation).  She prescribed him a steroid (prednisone), pain medication (acetaminophen), warm compresses on his low back, and to follow-up with Kaiser if he had worsening numbness in his legs.  *She instructed him that he*

---

[10] Principal incorrectly concluded that Mr. Linford was able to work with reasonable continuity is a sedentary occupation on a full-time basis.  He was only averaging about six hours per day, five days per week.  He got fired from Mega Capital and Breeze Funding, just like he was fired from Word & Brown, because he was not able to work with reasonable continuity or perform his job duties because of his chronic back, neck and extremity pain.  That lead to dismal commission-based earnings.  Though he "worked" for up to five-to-six hours per day, he is and was only able to sit, type, mouse and look at the computer intermittently for brief periods.  For example, he could only sit for 2.5-to-three total hours per five-to-six-hour shift, not with reasonable continuity.  The Ninth Circuit held that where a claimant's attending physicians agreed he could sit at most four hours per eight-hour workday, he was per se totally disabled from performing his own sedentary occupation, and any other sedentary occupation, because sedentary jobs require mostly sitting and generally at least six hours per day.  *See Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016).  So, a sitting capacity of even less than the claimant in *Armani* had, at just 2.5-to-three hours instead of four hours per workday, whom the court found was totally disabled, necessarily means that Mr. Linford is at least residually disabled if not totally disabled.  Because of his sitting and other work limits, Mr. Linford obviously cannot engage in a sedentary occupation with reasonable continuity.
[11] Dr. Herman first examined Mr. Linford in January 2016 for low back pain and has treated him several times since.

Case No.:



*should lie down on his back, not sit.  But if he had to sit, he must change positions every 30 minutes, take breaks from sitting, and get up and walk around or lie down.* She planned to obtain and review his MRI images.

29.     On September 18, 2017, Adrian Christopher Nickolescu, M.D., a specialist in physiatry from Kaiser's Physical Medicine Department, examined Mr. Linford in-person for a follow-up after his consult with his PCP Dr. Herman.[12]  Mr. Linford complained of back pain, mostly in his low back, and upper extremity pain. Dr. Nickolescu reviewed Mr. Linford's 2015 upper and lower extremity EMG/NCV studies and observed that they showed he had carpal tunnel syndrome and cubital tunnel syndrome.  He reviewed his 2015 cervical and lumbar MRIs and agreed that he had degenerative disc disease in his cervical spine and in his lumbar spine at L5-S1.  He documented that his patient had chronic low back pain stemming from a car accident when he was a teenager that never resolved with chiropractic treatment. That he currently had constant low back pain, right shoulder blade (upper/cervical back) pain that radiated down to his right arm, and numbness in both his hands.  Dr. Nickolescu performed a physical exam, including objective clinical tests.  His tests confirmed that Mr. Linford had neurologic "focal weakness;" tenderness in his cervical and lumbar spine; decreased sensation, strength, muscle atrophy/deformity and finger abduction in his right hand along the medial nerve distribution; and decreased sensation and muscle atrophy/deformity in his left hand along the ulnar nerve distribution.  Based on all this foundation, Dr. Nickolescu diagnosed Mr. Linford with: (1) Chronic back pain; (2) Cervical radiculopathy; (3) Left cubital tunnel syndrome (ulnar nerve entrapment at his left elbow); and (4) Right carpal tunnel syndrome.  Dr. Nickolescu ordered new cervical and lumbar MRIs and a NCV study of his upper extremities.  *He certified that Mr. Linford was disabled*

---

[12] Dr. Nickolescu first examined Mr. Linford in February 2016, as referred by Dr. Herman, for back pain and cubital tunnel syndrome.  He has treated him several times since.



1   *from working more than part-time and gave him work restrictions.*

2

3       30.     On September 21, 2017, Dr. Nickolescu had a telephone appointment

4   with Mr. Linford and referred him to a chiropractor for his several orthopedic

5   problems.

6

7       31.     On September 28, 2017, Dr. Nickolescu conducted the new EMG/NCV

8   studies on Mr. Linford's upper extremities.  The results were abnormal.  Just as in

9   2015, the studies objectively measured that Mr. Linford had abnormal activity in his

10  upper extremity muscles and nerves.  Dr. Nickolescu concluded that the studies

11  showed that Mr. Linford had: (1) Axonal motor neuropathy along his right median

12  nerve; and (2) Axonal motor neuropathy along his left ulnar nerve.  Dr. Nickolescu

13  corroborated his earlier upper extremity diagnoses and thus continued to diagnose

14  Mr. Linford with: (1) Right carpal tunnel syndrome (median neuropathy); and (2)

15  Left cubital tunnel syndrome (ulnar neuropathy).

16

17      32.     Dr. Herman continued to examine and telephone consult with Mr.

18  Linford regularly, including on October 23, October 30, November 7, November 9,

19  November 15, and December 14, 2017.  During the October 30 in-person exam and

20  November 7 phone consult, Mr. Linford complained of fatigue, joint and body

21  aches, and insomnia.  Dr. Herman took her patient's labs, physically examined him,

22  and conducted range of motion and other tests related to his orthopedic problems.

23  Dr. Herman documented, after reviewing his symptoms, that he was positive for

24  musculoskeletal joint pain and myalgias, neurologic weakness, malaise/fatigue, and

25  insomnia.  Based thereon, during these visits, Dr. Herman diagnosed Mr. Linford

26  with: (1) Sciatica to his legs from his lumbar spine; (2) Osteoarthritis in his lumbar

27  spine; (3) Joint pain; (4) Myalgias; and (5) Fatigue.  For the December 14 encounter,

28  Dr. Herman added to her diagnoses: (6) Chronic low back pain; (7) Thoracic



myofascial pain syndrome (chronic mid-back muscle pain); and (8) Right median neuropathy/carpal tunnel syndrome.  She prescribed several medications and supplements, referred him to the sleep clinic, and to follow-up with Kaiser.  *During the November 15 and December 14 visits, Dr. Herman certified that Mr. Linford was disabled from working more than part-time due to these conditions and gave him work restrictions.*

33.     After Principal terminated his benefits, Mr. Linford's treating physicians at Kaiser continued to certify that he was disabled from working, based on their numerous in-person exams of him, just like they had done in the past.  For example, *on September 18, 2017, Dr. Nickolescu certified that Mr. Linford could not work and was totally disabled from working at least through November 16, 2017 (the date of his follow-up visit), unless his then employer Mega Capital accommodated his work restrictions.*  He certified that his patient could work at most five hours per day, five days per week (25 hours per week), due to his low back, neck, and upper and lower extremity pain.  *Dr. Nickolescu gave Mr. Linford the following work restrictions and limitations: (1) Work at most five hours per day, five days per week; (2) Sit at most 2.5 hours total per five-hour workday* (up to 50% of the shift); (3) Sit intermittently for short periods during that 2.5 hours (broken up by rest breaks); (4) Stand at most 1.25 hours total per five-hour workday (up to 25% of the shift); (5) Walk at most 1.25 hours total per five-hour workday (up to 25% of the shift); (6) *Keyboard/mouse at most 1.25 hours total per five-hour workday* (up to 25% of the shift); (7) Repetitive right hand motions at most 1.25 hours total per five-hour workday (up to 25% of the shift); and (8) Drive at most 1.25 hours total per five-hour workday (up to 25% of the shift).

34.     *On November 15, 2017, Dr. Herman certified that Mr. Linford could not work and was totally disabled from working at least from November 16, 2017*

Case No.:



1    *through December 16, 2017, unless his then employer Mega Capital accommodated*

2    *his work restrictions.*  She certified that her patient could work at most six hours per

3    day, five days per week (30 hours per week), due to his low back, neck, and upper

4    and lower extremity pain.  *Dr. Herman gave Mr. Linford the following work*

5    *restrictions and limitations: (1) Work at most six hours per day, five days per week;*

6    *(2) Sit at most three hours total per six-hour workday* (up to 50% of the shift); (3)

7    Sit intermittently for short periods during that three hours (broken up by rest

8    breaks); (4) Stand at most 1.5 hours total per six-hour workday (up to 25% of the

9    shift); (5) Walk at most 1.5 hours total per six-hour workday (up to 25% of the

10   shift); (6) *Keyboard/mouse at most 1.5 hours total per six-hour workday* (up to 25%

11   of the shift); (7) Repetitive right hand motions at most 1.5 hours total per six-hour

12   workday (up to 25% of the shift); and (8) Drive at most 1.5 hours total per six-hour

13   workday (up to 25% of the shift).  *On December 14, 2017, Dr. Herman again gave*

14   *Mr. Linford the identical work restrictions and limitations, and she certified that*

15   *Mr. Linford could not work and was totally disabled from working at least from*

16   *December 14, 2017 through March 14, 2018, unless his then employer (Mega*

17   *Capital and then Trust Financial Group) accommodated his work restrictions, due*

18   *to his chronic spinal pain and carpal tunnel syndrome.*

19

20        35.    On December 13, 2017, Principal's agent Disability Insurance

21   Specialists ("DIS") interviewed and observed Mr. Linford at his home per

22   Principal's request.  Specifically, DIS's field agent Keith Scarlett, hired by

23   Prudential, conducted the interview.  *Mr. Scarlett observed that: (1) Mr. Linford*

24   *walked with a limp and "very stiff back;" (2) He had to constantly change positions*

25   *while seated even in a recliner chair during the 75-minute interview because sitting*

26   *exacerbated his low back pain* (he would either stand up, move to the couch or

27   change positions in his recliner); (3) He was seldom in the same position for more

28   than ten minutes; (4) *He struggled when he sat up and got out of his chair*; (5) He

Case No.: 

used a back massager while he was there; (6) He had a special seat cushion to help with his pain; and (7) He had atrophy in his left forearm muscle.  Mr. Scarlett did not comment in his report that it appeared as if Mr. Linford was faking or exaggerating.  Instead, that he had observed that Mr. Linford had these struggles. Mrs. Linford reported to Mr. Scarlett that her husband had to change positions every ten minutes in her experience due to his low back pain.  Mr. Linford agreed and also reported that: (1) He sleeps poorly due to his pain; (2) *Word & Brown terminated his employment because, while he tried to work full time, his employer said he was not performing well in sales due to his pain and health problems*; and (3) He started work later with another company, American Capital, in 2017 assisting mortgage brokers but could only work about five hours per day because of his constant pain (and had to change positions often) per his doctor.  Because of his chronic pain, he made little to no earnings in that job.

36.     On January 30, 2018, despite even more medical documentation supporting his partial disability, Principal reaffirmed its May 2017 decision to terminate Mr. Linford's disability benefits and denied his appeal.  Principal concluded that disability benefits were no longer payable under the Policy's "any other occupation" disability standard beyond May 17, 2017 because Mr. Linford had the transferable work skills and physical capacity to engage with reasonable continuity in, and perform the material duties of, three sedentary occupations full time (given his past work experience and education) and, accordingly, was no longer residually disabled under the Policy.  Principal relied on the opinions of two consultants: (1) Howard Grattan, M.D., a physiatrist from Reliable Review Services ("RRS") who reviewed Mr. Linford's medical file but did not examine or speak with him or his treating physicians, and concluded that his medical records showed he could work full time, 40 hours per week, eight hours per day, in a sedentary occupation but subject to several physical work restrictions and limitations, such as

Case No.:



he can: (a) sit at most six hours total per eight-hour workday, but only for 60 minutes at one time, and he must have the ability to alter or change positions, (b) only "occasionally" flex, extend and rotate his neck, (c) type "continually" (presumably for eight hours per workday), but only for 30 minutes at one time at which time he must be allowed a five-minute break, (d) walk or stand at most six hours total per eight-hour workday, but only for 30 minutes at one time; and (2) Its unidentified vocational employee who performed a transferable skills e-Dictionary of Occupational Titles ("DOT") analysis and irrationally concluded that Mr. Linford had the skills to perform three alternative full-time sedentary occupations, including Commercial Loan Collector, Business Development Specialist and Customer Service Representative (Specialized Calls), based on Mr. Linford's education and prior work experience.  Principal's claim denial relies on and mirrors the reasoning of its consultants.

37.    *On April 17, 2018, Moshe Lewis, M.D., a physiatrist with insurance industry medical peer review organization MCN, examined Mr. Linford and certified that he was disabled from working more than six hours per day* in any job that required prolonged use of his neck or a computer to keyboard and mouse, due to his cervical, thoracic and lumbar spine pain and elbow pain.  Dr. Lewis gave Mr. Linford the following work restrictions and limitations: work at most six hours per day; activities requiring prolonged neck extension or flexion/bending (like using a computer screen) at most six hours total per day; keyboard/mouse at most six hours total per workday; no prolonged sitting, computer/neck use, keyboard/mouse use – these activities can be done only intermittently for short periods (sit breaks and computer use breaks required); must use ergonomically correct work station; and lift



1    at most 20 pounds.[13]

2

3        38.    On June 12, 2018, based on the same reasoning, Principal reaffirmed its

4    decision to terminate Mr. Linford's disability benefits and denied his second appeal,

5    again concluding that Mr. Linford, as of May 18, 2017, had the physical capacity

6    and transferable skills to perform "any occupation" full time.  This time, Principal

7    relied on the opinions of two different consultants: (1) Arlen Green, D.O., a

8    physiatrist from Network Medical Review Co. Ltd. ("NMR") who reviewed Mr.

9    Linford's medical file but did not examine or speak with him or his treating

10   physicians, and concluded that his medical records showed he could work full time,

11   40 hours per week, eight hours per day in a sedentary occupation subject to almost

12   the identical physical work restrictions and limitations that Principal's other medical

13   consultant Dr. Grattan found;[14] and (2) Christine Lindholm, MSE, CDMS, QRC, a

14   vocational consultant from Alaris who performed a transferable skills analysis and

15   irrationally concluded that Mr. Linford had the skills to perform three different

16   sedentary occupations, including Auto Damage Insurance Appraiser, Insurance

17   Adjuster (Appraiser/ Examiner/ Investigator) and Loan Officer, based on Mr.

18   Linford's education and prior work experience.  Principal and its medical

19   consultant, just as they had in connection with Principal's first appeal denial, agreed

20   that Mr. Linford had several objectively verified chronic medical conditions in his

21

22   [13] Principal asked Mr. Linford to attend an IME with its agent MCN/Dr. Lewis in
     November 2017 and April 2018.  The parties were not able to coordinate their
23   schedules, so Principal cancelled the IME and decided to use a different medical
     consultant.  Principal elected to do a "paper review" with Dr. Grattan of RRS
24   instead of an IME.  Mr. Linford eventually scheduled an appointment with and saw
     Dr. Lewis one time on his own accord in April 2018, because Principal stated that it
25   was not able to get an appointment with Dr. Lewis but wanted Mr. Linford to see
     him.  Dr. Lewis is a "hybrid" doctor.  He is not Mr. Linford's treating physician, yet
26   he is also not Principal's consultant because Principal never formally retained him to
     conduct an IME.
27   [14] Dr. Green differed from Dr. Grattan in his opinions in only one respect.  He
     imposed much more severe typing limits than Dr. Grattan.  Dr. Green concluded that
28   Mr. Linford could type, keyboard and mouse only "occasionally" during a workday
     and that he must be allowed a ten-minute break from those activities every hour.



Case No.:

back, neck and extremities.  Principal's second appeal denial relies on and mirrors the reasoning of these two consultants.  Yet, Principal further concluded that Mr. Linford "can also perform [his] Own Occupation as a benefit advisor full time within the restrictions and limitations," despite that its expert consultants never offered an opinion on that subject, that Principal itself had previously concluded he could not, and that its own IME consultant Dr. Yokoo had concluded that Mr. Linford's work restrictions were permanent.

39.     There are countless other medical records in Principal's administrative record that document Mr. Linford's disabling back, neck and extremity pain and numbness.  Due to the size of the record, well exceeding 6,000 pages, this Complaint summarizes only some of the records.

40.     The opinions of Principal's biased "paper reviewers" are far less credible than Mr. Linford's highly qualified treating physicians.  As detailed above, the medical evidence overwhelmingly establishes that Mr. Linford was and is residually disabled from engaging in any type of occupation with reasonable continuity (for which he has the transferable skills to perform) during the relevant time, i.e., from May 2017 onward.  Instead of accepting the medical records of his highly respected treating physicians who certified his partial disability, Principal relied on the opinions of two biased medical consultants, Drs. Grattan and Green, who conducted mere "paper reviews" of Mr. Linford's medical records.  Their opinions are less credible than those of the physicians who examined Mr. Linford in person, who treated him for years and who, therefore, are far better suited to render credible opinions.

41.     There are many problems with the conclusions of Principal's "paper reviewers" and thus Principal's benefits decision that is based on their reports.  First,





1   Dr. Grattan,[15] Dr. Green and the vendors through which Principal retained them,

2   RRS[16] and NMR,[17] are Principal's paid consultants used repeatedly by Principal and

3   other insurers in the past to give disability opinions.  RRS[18] and NMR[19] cater to the

4   insurance industry according to their Websites.  Drs. Grattan and Green have been

5   criticized by federal judges in disability cases for their opinions in past cases.[20]  A

6   court will review Principal's claim denial with skepticism because it relied on

7   financially conflicted, biased consultants who are sold out to the insurance

8   industry.[21]

9

10      42.    Second, Principal's consultants failed to examine Mr. Linford and

11   failed to speak with him or his doctors (who have regularly treated him for years and

12   consequently gained great insight into his work limits).  Therefore, their opinions,

13   based purely on a "cold file review" of Mr. Linford's medical records, carry far less

14   weight.  Drs. Grattan and Green simply do not have the benefit of the insight gained

15   through personal observation.

16

17      43.    Third, Drs. Grattan's and Green's opinion reports are internally

18   inconsistent and illogical.  Their conclusion that Mr. Linford can work a full-time

19   _____

[15] *See*, e.g., *Paquin v. Prudential Ins. Co. of Am.*, 2018 WL 3586397, at *4 (D. Colo.
20   July 26, 2018) ("Dr. Grattan reviewed files for Prudential at least 54 times in" 2014-
2015).
21   [16] Principal has retained RRS several times just per published cases.  *See*, e.g., *Card
v. Principal Life Ins. Co.*, 790 F. App'x 730, 738 (6th Cir. 2019); *Miles v. Principal
22   Life Ins. Co.*, 720 F.3d 472, 479 (2d Cir. 2013).
[17] A Westlaw search shows that several different insurance companies have retained
23   NMR over 100 times in the last several years, just in published cases.  This number
is of course likely much larger than 100.
24   [18] *See https://www.reliablers.com/about.*
[19] *See https://www.nmrco.com/.*
25   [20] *See Paquin*, 2018 WL 3586397, at *7 (rejecting Dr. Grattan's opinion and finding
that insurer abused its discretion by relying on it); *Aguirre v. Astrue*, 2010 WL
26   4811787, at *4, 10 (D. Ariz. Nov. 19, 2010) ("The ALJ did not err in discounting
Dr. Green's opinion and articulated clear and convincing reasons for doing so. The
27   ALJ noted that Dr. Green's opinion . . . [is] inconsistent with medical opinions and
the record as a whole . . ." (internal citations omitted)).
28   [21] *See Demer v. IBM*, 835 F.3d 893, 901-03 (9th Cir. 2016); *Black & Decker
Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

1  sedentary job, eight hours per day, 40 hours per week, does not logically follow

2  from the medical facts that they conceded and accepted as true.  Dr. Green and Dr.

3  Grattan each agreed in their respective opinion reports that Mr. Linford has: (1)

4  Cervical radiculopathy; (2) Bulging discs in his cervical spine; (3) Lumbar

5  radiculopathy; (4) Sciatica; (5) Severe right and moderate to severe left foraminal

6  narrowing with compression of the right L5 nerve root; (6) Bulging discs in his

7  lumbar spine; (7) Osteoarthritis in his lumbar spine; (8) Other lumbar problems; (9)

8  Severe left ulnar nerve entrapment and neuropathy at his elbow/cubital tunnel

9  syndrome; (10) Severe right carpal tunnel syndrome/median neuropathy in his

10 hand/wrist; (11) Muscle atrophy in his left and right hands; and (12) Diminished

11 sensation in his left ulnar and right median nerve distribution areas (left elbow and

12 forearm and right wrist and hand).  Drs. Green and Grattan explained that the

13 objective medical evidence, including diagnostic studies and testing, lumbar and

14 cervical MRIs, electrodiagnostic studies, 2015 and 2017 EMG/NCV tests of the

15 upper and lower extremities, loss of sensation, and atrophy, all evidenced that Mr.

16 Linford has these conditions.  That Mr. Linford is not exaggerating or magnifying

17 his symptoms.  And that his subjective complaints of upper and lower back pain

18 with numbness and tingling to his extremities correlate with the objective medical

19 findings.

20

21      44.    It is therefore nonsensical that Mr. Linford could work full time, eight

22 hours per day, 40 hours per week, given that everyone agrees he has these

23 objectively verified medical conditions, even Principal's own medical consultants.

24 Ordinarily, it would not be expected that a patient could work full time in a

25 sedentary desk job if he has chronic low back pain, resulting pain, numbness and

26 tingling radiating to his lower extremities, cervical and lumbar radiculopathy, and

27 severe carpal and cubital tunnel syndrome in his hands, wrists, forearms and elbows,

28 facts Drs. Green and Grattan conceded are true.  It would make perfect sense that

Case No.:



such a patient like Mr. Linford would not be able to work, sit and type full time or with reasonable continuity (like sedentary jobs require), just as his attending physicians concluded, because these activities exacerbate his chronic low back and upper and lower extremity pain.

45.     Principal's medical consultants never explained why they thought Mr. Linford could work full time in a sedentary job despite his extremely poor health. Instead, they listed all of Mr. Linford's dire medical conditions and then concluded without explanation that he could work full time.  Courts have repeatedly criticized insurers' (and others') medical consultants for this precise conduct.[22]  Because Drs. Grattan's and Green's opinion reports are internally inconsistent, in that their ultimate conclusion does not logically follow from the medical facts that they both concede are true, their opinions are not persuasive and should be rejected by the Court.

46.     Fourth, Principal's benefits decision is incorrect because it relied on conclusory opinions from paper reviewers that did not make it clear in their reports why they disagreed with an examining doctor.  *See Carrier*, 116 F. Supp. 3d at 1081-82.  Drs. Green and Grattan state their conclusions that Mr. Linford can work full time (eight hours per day, five days per week) in a sedentary job without

---

[22] *See Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d 1067, 1083 (C.D. Cal. 2015) ("neither Dr. Niamehr nor Dr. McPhee provide much reasoned analysis supporting their opposing conclusions"); *Ricks v. Comm'r of Soc. Sec.*, 2018 WL 3543083, at *6 (W.D. Ky. July 23, 2018) (rejecting doctor's opinions because the medical evidence and face of his "own consultative examination report entirely contradicts" his opinions); *Maynard v. Berryhill*, 2018 WL 2275558, at *12 (S.D.W. Va. Apr. 24, 2018), report and recommendation adopted, 2018 WL 2272919 (S.D.W. Va. May 17, 2018) ("when comparing Dr. Gale-Dyer's opinion to the clinical findings made during his examination of Claimant, there is an obvious disconnect . . . Absolutely nothing about the clinical notations provides a factual foundation for the extreme limitations imposed by Dr. Gale-Dyer in his opinion"); *Workman v. Berryhill*, 2017 WL 3880661, at *5 (E.D. Ky. Sept. 5, 2017) (rejecting Dr. Gale-Dyer's opinion because "if he had referenced his own medical findings, he would have found that his opinions were inconsistent with the objective medical evidence he observed during his examination").

Case No.:

explaining why their opinions are drastically different than Mr. Linford's treating physicians, Drs. Herman and Nickolescu.  Therefore, their opinions are not credible under *Carrier*.[23]

47.     Dr. Green is particularly culpable of making conclusory opinions with no supporting reasoning or evidence.  Principal explicitly asked him in referral question 11, "[D]o you agree with the opinions of the claimants treating providers [about] the restrictions/limitations that would affect the claimants work abilities? . . . a. If no, please explain how your opinion differs from the treating providers and list the objective findings to support your opinion," for "each provider" of whom you disagree.  Dr. Green answered by *concluding* that he disagreed with Dr. Herman's restriction of "no working greater than 6 hours" (and Dr. Herman's sitting, standing/walking, and keyboarding restrictions and limitations).  But that was it.  Dr. Green failed to go beyond his conclusionary answer.  He did not explain why he disagreed with Dr. Herman.  He did not list the objective medical evidence (or any evidence whatsoever) that supported his opinions (over that of Dr. Herman's differing opinions), even though Principal had overtly asked him that question.  Dr. Green, in a word, "punted."  He ignored what Principal had asked him to do (and found important enough to list as a separate referral question).  And he failed to meet the legal standard that ERISA case law (like *Carrier*) recognizes as critically important for an insurer's paper reviewing physician to do where he disagrees with an examining physician – explain his reasoning.  Because of that, Dr. Green's conclusory opinions have no evidentiary value and should not be trusted by the

---

[23] The law outside of the ERISA context is similar.  The "moving party's burden . . . cannot be satisfied by an expert declaration consisting of ultimate facts and conclusions that are unsupported by factual detail and reasoned explanation, even if it is admitted and unopposed."  *Doe v. Good Samaritan Hospital*, 23 Cal.App.5th 653, 657 (2018).  Because an expert opinion is worth no more than the reasons and facts on which it is based, an expert opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value.  *Id*. at 662.

Court.

48.     Fifth, even though Principal asked Dr. Green to explain why he disagreed with *each* treating physician, he did not bother to explain whether (or why) he disagreed with Dr. Nickolescu.  Instead, he cherry-picked the medical records that Principal gave him.  He did not summarize Dr. Nickolescu's September 18, 2017 work status report or September 21, 2017 progress notes and avoided his opinions so he would not have to explain why he disagreed with them (likely because he had no logical, reasonable basis on which to base any disagreement). Dr. Nickolescu is a specialist in the same physiatry discipline as Dr. Green and examined Mr. Linford during a critical period, September 2017, shortly after Principal terminated his benefits.  Dr. Nickolescu did a physical exam and EMG/NCV studies that should have been central to Dr. Green's analysis.  But he ignored Dr. Nickolescu's exam and EMG/NVC findings and work restriction opinions.  He failed to explain whether he disagreed with his EMG/NCV findings in the main rationale/opinion section of his report after he acknowledged them (albeit briefly) in his medical record summary.  Dr. Green also conspicuously ignored Dr. Herman's November 2017 office visit notes and work restriction opinions, again crucial medical evidence in the post-termination period.  He cherry-picked the records to make his implicit job, to favor his insurance client Principal, easier.  For these reasons, Dr. Green's opinions lack critical foundation and are not credible.[24]

---

[24] *See Winkler v. Metro. Life Ins. Co.*, 170 F. App'x 167, 168 (2d Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence, but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary."); *Stuart v. CVS Corp.*, 2010 WL 890181, at *6 & n. 3 (E.D. Mich. Mar. 10, 2010) (finding administrator's decision denying benefits to be arbitrary and capricious where file review physician's report indicated that physician had "selectively cherry-pick[ed] the medical records to support his non-disability finding"); *Black v. Hartford Life Ins. Co.*, 2019 WL 2422481, *7 (D. Oregon, June 10, 2019) (awarding benefits and finding insurer abused discretion because "Defendant has cherry-picked the evidence" by selectively picking

Footnote continues on next page…

Case No.:

49.     Sixth, Principal's own medical consultants could not even agree amongst themselves about Mr. Linford's work restrictions.  So, Principal never should have terminated Mr. Linford's benefits based on their conflicting opinions. Dr. Yokoo concluded that Mr. Linford could reach, grasp, and manipulate with his arms and hands to type and mouse, and use his neck to look at a computer, "rarely," for only 0 to 2.6 hours total per eight-hour workday.  Yet, Drs. Grattan and Green disagreed, that he could do more.  Dr. Grattan concluded that Mr. Linford could type "continually" for eight hours (if he took a five-minute break every 30 minutes), not "rarely."  Dr. Green concluded that he could type/mouse "occasionally" (if he took a ten-minute break every hour).  Drs. Grattan and Green both concluded that Mr. Linford could use his neck "occasionally," not just for 0 to 2.6 hours.  Dr. Yokoo's opinions are more credible because he examined Mr. Linford in person.  *In fact, every single physician that examined Mr. Linford in person, including his treaters and Principal's own IME consultant Dr. Yokoo, concluded that Mr. Linford had more severe work restrictions than Principal's paper reviewers opined.*

50.     Even if Drs. Grattan and Green are correct (they absolutely are not), Mr. Linford cannot perform a full-time sedentary job as they contend.  Sedentary occupations generally require frequent use of a computer to type and "mouse" while sitting at a desk and staring at a computer with one's neck for most the day, usually six-to-eight hours per day.[25]  Dr. Green conceded that Mr. Linford can type "occasionally" during an eight-hour workday if he has a ten-minute break every hour, and they both concluded he can use his neck at most "occasionally."  Mr.

---

"statements from the plaintiff's medical history that supported the decision to terminate her benefits, while ignoring evidence to support her disability").
[25] *See Minton v. Deloitte & Touche USA LLP Plan*, 631 F. Supp. 2d 1213, 1215 (N.D. Cal. 2009) ("His duties were primarily sedentary . . . large amounts of time spent working at a computer."); *Brown v. Colvin*, 2014 WL 6388540, at *8 (D. Or. Nov. 13, 2014) (vocational expert stating "many of the sedentary jobs required utilization of a computer"); *Armani*, 840 F.3d at 1163 (a sedentary job requires mostly sitting at a desk, at least six hours per day); *Wages v. Sec'y of Health & Human Servs.*, 755 F.2d 495, 498 (6th Cir. 1985) (same).

Case No.:



Linford obviously cannot perform a full-time sedentary job with these work limits because he would need to type, mouse, and stare at a computer for most the day, not just "occasionally."  Therefore, Principal should not have terminated benefits based on Drs. Grattan's and Green's reports because they do not support that conclusion.

51.     In 2017, Principal recognized this inconsistency in connection with its IME consultant Dr. Yokoo's opinions.  Yet, it still incorrectly relied on Drs. Grattan's and Green's illogical opinions in 2018 to terminate benefits.  After Dr. Yokoo concluded in his IME report that Mr. Linford could work full time in a sedentary job *and* had permanent work restrictions that he could only "rarely" (0 - 2.6 hours total per eight-hour workday) type/mouse and use his neck to look at the computer, Principal sent him a referral supplement to clarify his opinions.  Principal confusingly asked how both could be true.  Principal implicitly conceded at that time that no employer offering a full-time sedentary job would allow their employee to type and use the computer "rarely," not to mention take breaks every ten minutes like its medical consultants conceded.  *See* Principal 2/27/17 Supp. Referral to Dr. Yokoo (In your 2016 IME report, "you mark items that the claimant is capable of performing full time sedentary work if can change positions as needed for comfort but then mark rarely for use of right arm and left arm.  It is unclear after our review . . .")  Principal should have rejected its paper reviewers' illogical opinions for this reason.

52.     Finally, Principal's decision to deny Mr. Linford's disability benefits based on the "paper reviews" of Drs. Grattan and Green was improper, as such a course of action has been criticized by the Ninth Circuit.[26]  That is especially true because, here, two treating doctors (one a physiatrist specialist), Drs. Herman and

---

[26] *See Montour v. Hartford*, 588 F.3d 623, 630 (9th Cir. 2009) (citing *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).  *See also Michaels v. Equitable Life*, 305 F.App'x 896, 906-07 (3d Cir. 2009).

Case No.:



Nickolescu, whom have each examined Mr. Linford in-person regularly for years, have repeatedly certified him as partially disabled from performing any type of occupation, including even a sedentary one, based on their clinical exam observations and irrefutable, objective medical evidence (including their MRI images, EMG/NCV test results, and range of motion, palpation, reflex, sensation and other clinical tests).  In their opinion, he cannot work in even a sedentary occupation (which requires prolonged sitting, computer use and typing) with reasonable continuity or more than part-time because he has chronic, debilitating low back, mid-back, neck, leg, feet, arm, elbow, forearm, wrist, hand, finger and thumb pain, numbness, tingling and weakness from pinched nerves in his lumbar and cervical spine, elbows and wrists (caused by herniated, slipped and bulging discs, radiculopathy, osteoarthritis, degenerative disc disease, bone spurs and vertebral joint narrowing in his lumbar and cervical spine, and cubital and carpal tunnel syndrome from repetitive typing), which prevents him from working for more than five-to-six hours per day intermittently, five days per week, in even a purely sedentary occupation.  And which also limits his ability to sit to 2.5-to-three hours per workday and type/keyboard/mouse to 1.25-to-1.5 hours per workday.

53.     The opinions of these highly qualified physicians, having regularly examined the patient for years and having spoken with him in detail, carry far more weight than Principal's "paper reviewers," because the former had a better opportunity to assess his credibility and functional abilities.  *See Williams v. United Omaha*, 2013 WL 5519525, at *12 (N.D. Ala., Sept. 30, 2013) citing *Black & Decker*, *supra*, 538 U.S. at 832 (courts are required to evaluate the weight of each doctor's opinion based on the extent of the patient treatment history and his/her qualifications).  That court explained why the opinion of a treating physician is usually more credible: "[D]irect contact with the patient over a period of time would provide a more thorough opportunity to assess her credibility regarding level of pain



and the true pattern of her abilities." *Id.* The court found the claimant disabled by focusing heavily on the opinions of her treating physicians. *See also Jebian v. Hewlett-Packard*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (same).

54. The medical consultants on which Principal relied to terminate his benefits did not examine Mr. Linford, though its Policy permitted it. That raises questions about the credibility of their opinions and the accuracy of Principal's benefits denial. *See Shaw v. AT&T*, 795 F.3d 538, 550 (6th Cir. 2015). Especially because Principal just had a medical consultant, Dr. Yokoo, perform an IME, which it declined to use in favor of less credible "paper reviews" from Drs. Grattan and Green. After Dr. Yokoo examined Mr. Linford in person, he concluded in March 2017, just before Principal terminated his benefits, that Mr. Linford had much more restrictive work limits than Principal's paper reviewers had concluded, i.e., that Mr. Linford could "rarely" type and mouse on a computer, for 0 to 2.6 hours total per eight-hour workday.

55. Principal's "paper reviews" lack the foundation and insight gained through an in-person exam; are internally inconsistent with the objective MRI images, EMG/NCV studies and medical facts they concede are true; contradict each other, the medical evidence and Principal's own IME report; fail to explain their disagreement with Mr. Linford's treating physicians; ignore key medical-exam notes; make an incorrect conclusion (that Mr. Linford can perform a full-time sedentary job) that contradicts Ninth Circuit law and Principal's consultants' own opinions about his work restrictions; and are conclusory, illogical, internally inconsistent, poorly reasoned and shrift in analysis. Accordingly, Principal's benefit determination is incorrect. This is especially true because the treating physicians who examined Mr. Linford in person were far better suited to render credible opinions than Principal's "paper reviewers," as the former treated the patient



1    regularly for years, as opposed to biased consultants used repeatedly by Principal in

2    the past who never examined or spoke to Mr. Linford or his attending physicians.

3

4        56.     Additionally, Principal improperly terminated Mr. Linford's disability

5    benefits after paying him these benefits for years. Principal changed its position

6    about Mr. Linford's disability status, from totally or residually disabled from his

7    own sedentary occupation to "not residually disabled" from a sedentary occupation,

8    without substantial evidence that his medical condition improved. That was

9    unequivocally improper under applicable case law.[27] Principal paid Mr. Linford

10    disability benefits for two years, from May 2015 to May 2017. Based on his

11    medical records, it concluded that he was totally or residually disabled from

12    performing his own sedentary occupational duties (as a health insurance policy

13    benefit advisor) with reasonable continuity and from earning a gainful income

14    during that entire time and, in fact, since December 2014. It then reversed course

15    and terminated his benefits despite there being no substantial new evidence

16    establishing that he could work in a sedentary occupation with reasonable continuity

17    or that his condition had improved. In fact, Dr. Herman's August 2017 progress

18    notes document that Mr. Linford's condition worsened in May 2017. Principal's

19    *own* IME physiatrist consultant, Dr. Yokoo, concluded that Mr. Linford had

20    permanent work restrictions that would not change given his chronic orthopedic

21    pain and that his condition had not changed at least from December 2014 to March

22    2017 when he authored his final IME supplement. Moreover, the very same type of

23    medical records Principal used to approve Mr. Linford's claim, it later used to

24

---

[27] *Saffon v. Wells Fargo*, 522 F.3d 863, 871 (9th Cir. 2008) ("MetLife had been

25   paying Saffon long-term disability benefits for a year, which suggests that she was
already disabled. In order to find her no longer disabled, one would expect the MRIs

26   to show an improvement, not a lack of degeneration"); *McOsker v. Paul Revere*, 279
F.3d 586, 589 (8th Cir. 2002) (Circuit Court explained "[w]e are not suggesting that

27   paying benefits operates forever as an estoppel so that an insurer can never change
its mind; but unless information available to an insurer alters in some significant

28   way, the previous payment of benefits is a circumstance that must weigh against the
propriety of an insurer's decision to discontinue those payments.")



1   terminate it.[28]  Because Principal decided Mr. Linford was no longer residually

2   disabled without substantial new medical evidence to support its position, its

3   decision to terminate his benefits was incorrect.

4

5      57.    The inconsistency in Principal's claim decisions is conspicuous.  That

6   tends to show that its termination decisions were not well reasoned nor carefully

7   decided, as ERISA regulations require.  Principal's claim representative Eleanor

8   Harris, in her June 2018 second appeal denial, concluded that Mr. Linford could

9   perform his own occupation as a National Benefit Advisor full time.  That directly

10  contradicts what Principal had repeatedly concluded from 2015 to 2017, that Mr.

11  Linford could not perform his own occupation.  Ms. Eleanor did not explain her one

12  sentence contradictory conclusion in her denial letter or in the claim logs.  She just

13  made a conclusory statement.  While Principal's own vocational expert had just

14  concluded in her June 2018 transferable skills analysis that Mr. Linford could

15  perform three other sedentary occupations, she said nothing about whether he could

16  perform his own occupation.  So, Principal made a rogue, rash, unexplained

17  conclusion that contradicted its own vocational expert's recent opinion and

18  Principal's prior conclusion that Mr. Linford could not perform his own occupation.

19  Principal did not make a sound, reasoned decision as the ERISA regulations require.

20  It just wanted to stop paying Mr. Linford and so made inconsistent findings to

21  support its precontrived denial decision, despite that it had no evidence that his

22  medical condition had improved.

23

24      58.    Principal's "any occupation" transferable skills analysis is flawed and

25  led it to improperly terminate Mr. Linford's disability benefits.  One of the primary

26

27  ────────────────────
    [28] *See Fifield v. HM Life Ins. Co.*, 2012 U.S. Dist. LEXIS 140880, *21 (D.N.H.
    2012) (holding that it was improper for administrator to find the claimant "was not
28  disabled based on the same medical records that they deemed sufficient to support
    her disability" and the termination was not supported by "substantial evidence").

1    reasons Principal terminated Mr. Linford's benefits was its conclusion that six

2    sedentary, gainful occupations existed which Mr. Linford could satisfactorily

3    perform full time given his education, training, transferable skills, work experience

4    and functional capacity.  Principal's vocational employee concluded in her eDOT

5    transferable skills analysis report that Mr. Linford could transition into three

6    sedentary positions, as a Commercial Loan Collector, Business Development

7    Specialist and Customer Service Representative, based thereon.  Its vocational

8    consultant from Alaris, Ms. Lindholm, concluded in her transferable skills analysis

9    report that Mr. Linford could transition into three different sedentary positions, as an

10    Auto Damage Insurance Appraiser, Insurance Adjuster (Appraiser/ Examiner/

11    Investigator) and Loan Officer.  Principal relied on their reports for vocational

12    issues.  But, as explained below, the vocational employee's and Ms. Lindholm's

13    conclusions are flawed and thus led Principal to improperly terminate Mr. Linford's

14    benefits.

15

16        59.    First, Principal's vocational (and medical) consultants' opinion that Mr.

17    Linford can perform these six *sedentary* occupations full time, despite that they all

18    conceded that he cannot sit for prolonged periods at one time, despite that Principal

19    conceded he was totally disabled in his own *sedentary* occupation for the entire own

20    occupation period, and despite that he must regularly change his position, is

21    blatantly inconsistent and is incorrect under Ninth Circuit law.  Principal and its

22    consultants concluded without any evidence that these sedentary occupations would

23    necessarily allow him to alternate between sitting, standing, and walking, or to

24    change positions as needed for comfort throughout the entire workday.  But nothing

25    in the administrative record (or the Department of Labor's Dictionary of

26    Occupational Titles) supports this conclusory statement about the occupational

27    duties.  The evidence is the opposite.  The eDOT job descriptions that the vocational

28    employee attached to her transferable skills analysis state that a "Sit/Stand Option"



1   is: (1) "Not Present" for a Commercial Loan Collector; and (2) Only available

2   "Occasionally," "up to ⅓ of the time," for a Business Development Specialist or

3   Customer Service Representative (i.e. for 0 to 2.6 hours of an eight-hour workday),

4   not the entire day.  The administrative record is silent about whether the other three

5   occupations (that Ms. Lindholm concluded he could perform), allow an employee to

6   adjust his position in his chair or alternate between sitting and standing.

7

8       60.     In *Salz v. Standard Ins. Co.*, 380 F. App'x 723 (9th Cir. 2010), the court

9   rejected an insurer's identical argument and thus concluded the district court erred

10  by adopting the argument.

11

12          Standard stated that Salz's managerial occupation "would typically

13          allow for maximum self-regulated flexibility in position change," but

14          we can locate nothing in the DOT (and no evidence in the

15          administrative record) to support this conclusory statement.

16

17  *Id.* at 724.  The court also rejected the argument that an insurer can infer from the

18  DOT's definition of a sedentary occupation ("sitting most of the time"), that such an

19  occupation would allow for position changes.  *Id.*; *see also Salz v. Standard Ins. Co.*,

20  554 F. App'x 600, 603 (9th Cir. 2014) (reversing district court a second time for

21  same reason and rejecting court's rationale that "it would seem to be common sense,

22  if nothing else, that an individual acting in a managerial capacity [in a sedentary

23  occupation] would be able to change his positioning as needed in order to avoid

24  discomfort").  Because the record contains no evidence that the sedentary

25  occupations Principal claims Mr. Linford can perform would allow him to shift

26  positions in his chair or stand/walk as needed – the evidence is the opposite or

27  absent – its vocational (and medical) consultants' opinions and Principal's benefits

28  decision must be rejected as contrary to Ninth Circuit law.



61.     Second, Ms. Lindholm's conclusion that Mr. Linford has the transferable skills to satisfactorily perform these three sedentary occupations is not credible because her opinions are missing crucial foundation.  Conspicuously, glaringly and fatally, she never disclosed in her opinion report the job duties of those three occupations, nor the skills required to perform them.  That is improper. *See Turner v. Life Insurance Co. of North America*, 2017 WL 6000099, at *3–4 (W.D. Wash. Dec. 4, 2017) (holding vocational consultant must define duties of the other "any occupations" in his transferable skills analysis, including whether full-time work is required).  She did not, despite concluding in her report that Mr. Linford has the transferable skills to perform each of the three occupations.  The requisite job duties and skills of these alternate occupations are nowhere in her report, Principal's denial letters or its claim file.  While Principal's vocational consultant claims in her report that the three "occupations were selected as based on Mr. Linford's work skills, past work history[,] education, and . . . medical restrictions," she does not identify the duties of those alternate occupations, nor compare them to Mr. Linford's job skills and work experience.  Instead, she implicitly asks a court to trust her undisclosed analysis and, thus, unsupported conclusion that Mr. Linford has the transferable work and education skills to adequately perform as an Auto Damage Insurance Appraiser, Insurance Adjuster/Appraiser/Examiner/Investigator and Loan Officer.  For this reason, her opinion lacks foundation, is not credible, and should never have been accepted by Principal to terminate Mr. Linford's disability benefits.

62.     Third, Principal's eDOT transferable skills analysis is not credible because the report reaches illogical conclusions that are inconsistent with Principal's medical assumptions.  For example, in its referral, Principal instructed its vocational employee to assume that Mr. Linford could sit at most six hours total per eight-hour workday.  With that assumption, its employee in her eDOT report concluded that

Case No.:



Mr. Linford could work in two occupations that required the employee to "constantly" sit (Business Development Specialist and Customer Service Representative). Because its consultants' vocational analysis cannot be trusted for these reasons, Principal should not have relied on either report to terminate Mr. Linford's benefits.

63. In late 2020, after Principal had denied Mr. Linford's final administrative appeal (in 2018), the Social Security Administration ("SSA") decided that Mr. Linford was and is disabled and entitled to Social Security Disability Insurance ("SSDI") benefits. On December 21, 2020, the SSA sent a letter to Mr. Linford, notifying him that it found he had become disabled under Social Security rules as of September 2020. It explained that doctors and other trained staff decided he was and is disabled under its rules, and that the SSA expected him to be for at least "5 to 7 years," through December 2027, at which time they would review his claim again. A true and correct copy of the SSA's award letter is attached to the Complaint as Exhibit "3." *A medical doctor hired by the SSA, after conducting an in-person IME, had concluded that Mr. Linford was disabled due to his back problems and orthopedic issues.* Based thereon, the SSA concluded that Mr. Linford was and is disabled under its rules.

64. By this Complaint, Mr. Linford, through his counsel McKennon Law Group PC, provided Principal with the SSA's award letter for his SSDI claim. Mr. Linford could not have provided these important SSA records to Principal during the administrative process because it had closed as of June 12, 2018. They did not yet exist.

65. The SSA's decision and related records finding Mr. Linford disabled under Social Security rules are important and necessary for this Court to review

Case No.:

1    when reviewing Principal's benefits decision de novo.

2

3        66.    A government entity, the SSA, found Mr. Linford disabled under a

4    more rigorous disability standard than Principal's Policy requires, based on an IME

5    from an impartial medical expert retained by the SSA.  It did so on Mr. Linford's

6    very first application.  That is strong evidence that Principal made the wrong

7    decision by terminating Mr. Linford's disability benefits.[29]

8

9        67.    To qualify for residual disability benefits, Principal's Policy requires

10   only that Mr. Linford prove that while working in an occupation he is unable to

11   engage with reasonable continuity in "any other occupation" of which he is

12   reasonably qualified by his age, education and work experience (and that he does

13   not earn more than 80% of his predisability earnings from his part-time work).  But

14   the Social Security Act requires more, that Mr. Linford prove he cannot perform the

15   duties of his own past work (last 15 years), cannot engage in any other type of

16   substantial gainful work considering his age, education and work experience, *and*

17   that he earned at most $15,720 per year ($1,310 per month)[30] from any part-time

18   work he was able to do despite his partial disability.  The SSA's allowable part-time

19   work limit is much less than the more generous one Principal's Policy permits an

20   insured to work and still qualify for residual disability benefits, i.e., 80% of his

21   predisability earnings which, in Mr. Linford's case, means he can work and earn up

22

23



24   [29] *See Rouleau v. Liberty Life*, 2017 WL 359466, at *7 (W.D. Mich., Jan. 25, 2017)
     ("In its de novo review, the Court weighs the SSA determination heavily."); *see also*
25   *Montour v. Hartford*, 588 F.3d 623, 635 (9th Cir. 2009) (the Ninth Circuit warned
     that "not distinguishing the SSA's contrary conclusion may indicate a failure to
26   consider relevant evidence").
     [30] *See* Social Security Administration's website at
27   https://www.ssa.gov/oact/cola/sga.html ("To be eligible for [social security]
     disability benefits, a person must be unable to engage in substantial gainful activity
28   (SGA)," which limit for part-time work in 2021 was $1,310 per month or $15,720
     per year.)

Case No.:

to $82,488 per year ($6,874 per month).[31]  Mr. Linford was awarded disability benefits by the SSA after it found him disabled under Social Security rules, based on impartial medical expert opinion after an in-person exam.  Yet, while Principal terminated his Policy benefits, the SSA awarded Mr. Linford SSDI and "found that [he] became disabled under our rules" at least through December 2027.  The SSA thus concluded that Mr. Linford has been disabled from performing *any type of substantial gainful work* including his own sedentary work as a telephone call center health insurance benefit advisor/salesman during the relevant post-termination period of May 2017 onward.  That is strong, almost insurmountable evidence that Mr. Linford meets the Policy's (less onerous) residual disability standard, contrary to what Principal concluded.

68.     The proper standard of review is de novo.  Any grant of discretionary authority contained in the Plan is void in light of California Insurance Code Section 10110.6.  Plaintiff has been a California resident at all times relevant.  The Plan was renewed after January 1, 2012, the date the statute became effective.  Principal rendered its benefits decision after that date.  Thus, the denial of benefits at issue must be reviewed de novo.

69.     In a de novo review, "the burden of proof is placed on the claimant" to establish entitlement to plan benefits.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).  "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather

---

[31] *See Rowell v. Aviza*, 2012 WL 1672497, at *17 (N.D. Cal., May 14, 2012); 423 U.S.C. § 423(d)(1)(A); 423 U.S.C. § 423(d)(2)(A) (standard for SSDI disability benefits: "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .").



determines in the first instance if the claimant has adequately established that he or she [qualified for benefits] under the terms of the plan." *Id.* at 1295-96.  The trial court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine if the plan administrator correctly or incorrectly denied benefits.  *Silver v. Executive Car Leasing Long–Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  De novo review permits the trial court to "evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.1999).

70.     Regardless of the standard of review this Court applies, Defendants reached an incorrect decision, given the overwhelming medical records and other evidence presented during the claim that established that Plaintiff was and is disabled within the meaning of the Plan.

71.     Plaintiff exhausted his administrative remedies under the Plan and has the right to bring a legal action for benefits under ERISA Section 502(a). Principal's January 2018 denial letter on appeal concedes as much.

72.     Plaintiff is now and at all relevant times remained "disabled" as defined in the Plan, and has now and at all relevant times convincingly demonstrated his disability through medical records and other documents, information and correspondence.

## **FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees, Pre-Judgment Interest under ERISA Plan –

29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Principal and Does 1 through 10)

Case No.:



73.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

74.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan and/or to clarify his rights to future benefits under the terms of a plan.

75.     At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's ongoing claim for LTD benefits under the Plan, by terminating his benefits and by related acts and omissions, Defendants violated, and continue to violate, the terms of the Plan and, specifically, the Policy, and Plaintiff's rights thereunder.

76.     Defendants have failed to follow even the most rudimentary claims processing requirements of ERISA and of the Department of Labor Regulations and have failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Defendants to make benefit determinations, no deference is warranted with regard to Defendants' handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

77.     A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the participants and beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under



ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants, or its beneficiaries.  Defendants' handling of Plaintiff's disability benefit claim falls far short of these standards.

78.    For all the reasons set forth above, Principal's decision to deny disability benefits to Plaintiff was arbitrary, capricious, wrongful, unreasonable, irrational, incorrect, contrary to the evidence, contrary to the terms of the Plan and contrary to law.  Defendants improperly denied this claim, as the evidence shows their denial decision was not only incorrect but arbitrary and capricious.  Further, Defendants' denial decision and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  Defendants' denial of Plaintiff's claim was incorrect and improper, based upon all the evidence discussed herein.

79.    Alternatively, Plaintiff has met the burden of establishing he is disabled under a de novo standard of review due to symptoms of and including, without limit, debilitating back, neck, and upper and lower extremity pain, numbness, tingling and weakness from pinched nerves in his lumbar and cervical spine, elbows and wrists, all of which continuously plagued him from December 2014 through the present and continuing.

80.    As a direct and proximate result of Defendants' denial of disability benefits, Plaintiff has been deprived of LTD benefits from and after May 18, 2017.

Case No.:



81.    As a direct and proximate result of the denial of his claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

82.    A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff seeks the declaration of this Court that he meets the Plan definition of disability, and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim that is consistent with the terms of the Plan.

83.    Plaintiff alleges all the same conduct against Does 1 through 10 as he does against Principal in this First Cause of Action and in this Complaint.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.    For all Plan benefits due and owing Plaintiff, including LTD benefits;

2.    For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g);

3.    For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest



1     at the rate of 10% per annum, at the rate he was receiving on his lost

2     investments, if any, and/or due to the financial distress Defendants'

3     denial decision cause him, or at a different rate as permitted by federal

4     law; and

5     4.     For such other and further relief as this Court deems just and proper.

6

7     Dated:  May 14, 2021                    **McKENNON LAW GROUP PC**

8

9                                            By: _____

10                                           ROBERT J. McKENNON
                                             JOSEPH S. McMILLEN
                                             Attorneys for Plaintiff John Linford



## CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com.

I hereby certify that on Click here to enter a date., I served the foregoing documents described as: CAPPOS on the interested parties as follows:

[Insert]                                        Attorneys for [Insert]
☐ ECF Participant


☐ **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.  I served those parties who are not registered participants of the ECF System as indicated below.

☐ I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐ **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐ **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business.  The transmission was reported as complete, without error.

☐ **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct.  Executed at Newport Beach, California on Click here to enter a date..

NAME: _____

(Signature)

DOCUMENT1